**UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF LOUISIANA**

| | |
|---|---|
| **ANTHONY JOHNSON,** | |
| **Plaintiff,** | |
| **v.** | **Civil Action No.** |
| **THE CITY OF BOGALUSA, DISTRICT ATTORNEY'S OFFICE FOR THE 22ND JUDICIAL DISTRICT OF LOUISIANA, WALTER REED, MARION FARMER, LEWIS MURRAY a/k/a LOUIS MURRAY, WAYNE KEMP, GLEN MCCLENDON, MICHAEL EDWARDS, LAVERNE SPIKES, SHIRLEY ZEIGLER f/k/a SHIRLEY PHILLIPS, JANE AND JOHN DOES 1-25, and ABC INSURANCE COMPANIES 1-10,** | **JURY TRIAL DEMANDED** |
| **Defendants.** | |

<u>**COMPLAINT**</u>

<u>**NATURE OF THE ACTION**</u>

1.       Plaintiff Anthony Johnson was convicted of second degree murder and sentenced to life without parole in 1986 for a crime that he did not commit.  After more than 20 years in prison, Mr. Johnson was released in 2007 after a Louisiana state court vacated his conviction and ordered a new trial on the basis of newly discovered DNA evidence and the State's failure to

1

provide Mr. Johnson with numerous items of exculpatory evidence in the State's possession before, during and at all times after Mr. Johnson's murder trial.

2.     Mr. Johnson's ordeal was the result of a bad-faith effort by Defendants, acting under color of state law, to falsely accuse, prosecute, and convict him for a crime that he did not commit.  Defendants caused Mr. Johnson to be arrested and charged without probable cause, fabricated evidence, suppressed exculpatory evidence, gave plainly untrue, if not perjured, testimony, and conspired to violate Mr. Johnson's rights to due process of law and a fair trial.

3.     As a direct and proximate result of Defendants' conduct, Mr. Johnson suffered injuries and damages, including, but not limited to, the following:  personal injuries, pain and suffering,  severe mental anguish, emotional distress, lost income, physical illness, inadequate medical care, humiliation, injury to reputation, permanent psychological damage, and restriction of all forms of personal freedom, including, but not limited to, diet, sleep, personal contact, educational opportunity, vocational opportunity, personal fulfillment, family relations, travel, enjoyment, and expressions.  In short, Defendants by their conduct deprived Mr. Johnson of more than twenty years of his life as a free man.

4.     Mr. Johnson brings this suit pursuant to 42 U.S.C. §§ 1983, 1985, and Louisiana law to recover civil money damages for the violation of his rights guaranteed by the Fourth, Fifth, and Fourteenth Amendments to the United States Constitution and the laws of the State of Louisiana.

## JURISDICTION

5.      This Court has subject matter jurisdiction over Plaintiff's 42 U.S.C. §§ 1983 and

1985 claims pursuant to 28 U.S.C. §§ 1331 and 1343.  This Court has subject matter jurisdiction

over Plaintiff's remaining claims pursuant to 28 U.S.C. § 1367.

6.      Venue is proper in the Eastern District of Louisiana pursuant to 28 U.S.C. § 1391

because a substantial part of the acts or omissions giving rise to the claims occurred in this

district.

## PARTIES

7.      Plaintiff Anthony Johnson ("Plaintiff") was wrongfully accused and convicted of

murder in 1986 and spent more than 20 years in prison before recently being released.  He

currently resides in the New Orleans, Louisiana.

8.      Defendant City of Bogalusa ("Bogalusa") is a municipality within Washington

Parish, Louisiana, charged with the operation of the Bogalusa Police Department ("BPD").

9.      Defendant District Attorney's Office for the 22nd Judicial District of Louisiana,

Washington Parish ("22nd JDDA's Office") prosecutes accused criminal defendants in

Washington and St. Tammany Parishes, Louisiana.

10.     Defendant Walter P. Reed, whom Plaintiff sues in both his individual and official

capacities, was, at all times since January 1985, and is the District Attorney for the 22nd Judicial

District of Louisiana, Washington Parish.  Defendant Reed at all times acted under color of state

law, and in whole or in part, in his capacity as an employee and final policymaker of the 22nd

JDDA's Office.

3

11.     Defendant Marion B. Farmer, whom Plaintiff sues in his individual and official capacities, at all relevant times prior to January 1985 was the District Attorney for the 22nd Judicial District of Louisiana, Washington Parish.  Defendant Farmer at all relevant times acted under color of state law, and in whole or in part, in his capacity as an employee and final policymaker of the 22nd JDDA's Office.

12.     Defendant Lewis V. Murray III (a/k/a Louis Murray), whom Plaintiff sues in his individual and official capacities, at all relevant times was an Assistant District Attorney for the 22nd Judicial District of Louisiana, Washington Parish, who participated in the prosecution of Plaintiff.  Defendant Murray at all relevant times acted under color of state law, and in whole or in part, in his capacity as an employee of the 22nd JDDA's Office.

13.     Defendant Wayne Kemp, whom Plaintiff sues in his individual and official capacities, at all relevant times was a police officer employed by the BPD.  Defendant Kemp at all relevant times acted under color of state law, and in whole or in part, in his capacity as a BPD employee.

14.     Defendant Glen McClendon, whom Plaintiff sues in his individual and official capacities, at all relevant times was a police officer employed by the BPD.  Defendant McClendon at all relevant times acted under color of state law, and in whole or in part, in his capacity as a BPD employee.

15.     Defendant Michael Edwards, whom Plaintiff sues in his individual and official capacities, at all relevant times was a police officer employed by the BPD.  Defendant Edwards at all relevant times acted under color of state law, and in whole or in part, in his capacity as a BPD employee.

4

16.     Defendant Laverne Spikes, whom Plaintiff sues in his individual and official capacities, at all relevant times was a police officer employed by the BPD.  Defendant Spikes at all relevant times acted under color of state law, and in whole or in part, in his capacity as a BPD employee.

17.     Defendant Shirley Zeigler (f/k/a Shirley Phillips and; referred to herein as Defendant Phillips), whom Plaintiff sues solely in her official capacity, at all relevant times was a forensic scientist at the Louisiana State Police Crime Lab.  Defendant Phillips at all relevant times acted under color of state law, and in whole or in part, in her capacity as a state employee.

18.     Defendants John and Jane Does 1-25 are yet unknown individuals who, upon information and belief, participated in or are responsible for the actions that are subject to this lawsuit.  To the extent any of them can be said to be policymaking authorities whose actions represent the government entities they represent or to the extent any of them acted under of color of law, Plaintiff sues them in their official capacities.

19.     Defendants ABC Insurance Companies 1-10 are yet unknown insurance companies who, upon information and belief, have issued and currently have in effect one or more policies of insurance covering one or more of the Defendants name herein.

## FACTUAL ALLEGATIONS

20.     On February 25, 1986, Plaintiff was convicted on a charge of second-degree murder for the killing of his girlfriend, Angela Bonds.  The State's case against him rested primarily on a statement Plaintiff allegedly made during an untaped and untranscribed interview with police on the day of Ms. Bonds' murder that the State argued demonstrated by inference his prior knowledge of the murder weapons.  As further described below, this allegation was

5

knowingly false.  In fact, whatever knowledge Plaintiff had regarding the murder weapons came

from information he received from BPD officers prior to the interview in question.   Defendants

fabricated the allegation that his statement reflected special knowledge of the murder as a means

to indict Plaintiff for Ms. Bonds' murder.

21.     The jury's verdict was based on such tenuous evidence, in fact, that in response to

Plaintiff's motion for a post-verdict judgment of acquittal, the trial judge stated to Plaintiff's

counsel as follows:

> Mr. Meyer, the court can very candidly tell you that in this trial
> until the defendant took the stand, I had some misgivings about the
> business about every reasonable hypothesis.  I truly did. I
> considered the case that if the defendant had not taken the stand in
> this case, and a verdict had come back that this would be a very
> close case, one probably where, where the court could be in a
> position of having to grant a judgment verdict of acquittal.

22.     Moreover, in indicting and prosecuting Plaintiff for this murder, Defendants

Reed, Murray, and the 22nd JDDA's Office were in possession of numerous pieces of

exculpatory evidence that they withheld from Plaintiff before, during and after the trial.  As

further described herein, this key evidence[1] raised doubts about Plaintiff's guilt, and included

compelling evidence from multiple sources implicating another man, the man who Plaintiff

argued at trial was the real killer, in Bonds' murder.  Defendants Edwards and McClendon were

also aware of this evidence when they testified against Plaintiff at trial.  In plain violation of their

constitutional duty under *Brady v. Maryland*, 373 U.S. 83 (1963), however, prosecutors

suppressed the evidence.  In fact, since this exculpatory material has come to light, the 22nd

---

[1] The exculpatory evidence withheld from Mr. Johnson is described in detail at Paragraphs 48-63
& 71.

Judicial District Court has adjudicated the issue in Plaintiff's favor, holding that Defendant Reed

and the 22nd JDDA's Office violated *Brady* by failing to hand over these materials and vacating

Plaintiff's conviction after more than twenty years.

    1.  **Background**

  23.  Plaintiff and Ms. Bonds had been in an on-and-off romantic relationship for

several years.  In the fall of 1984, their relationship had grown closer, such that Plaintiff often

slept at Ms. Bonds' home, located at 1010 Ann Street in the City of Bogalusa, Parish of

Washington, Louisiana, though he also maintained his own residence a few miles away where he

kept most of his belongings.

  24.  On the morning of October 18, 1984, Plaintiff left Ms. Bonds' home and went to

work at the Bogalusa Medical Center where he was employed as an orderly tending to patients.

After a full day's work, Plaintiff returned to his apartment before going to Jugs, a local bar

located a few blocks from Ms. Bonds' home.

  25.  At 9:30 p.m. that evening, Plaintiff arrived at Ms. Bonds' home to ask her if she

wanted him to purchase her boiled crabs that they were selling at Jugs.  Ms. Bonds said that she

did, and Plaintiff returned to Jugs to purchase the crabs.  When Plaintiff returned to Ms. Bonds'

home at approximately 11:30 p.m., however, Ms. Bonds refused to let him in the house, saying

he had taken too long to return.  After briefly returning to Jugs, Plaintiff again returned to Ms.

Bonds' house, but she again refused to let him in.  Plaintiff left Ms. Bonds' residence, briefly

stopped by Jugs, and arrived back at his apartment at approximately 12:30 a.m., at which time he

immediately went to sleep.

  26.  On the morning of October 19, 1984, at approximately 9:30 a.m., Ms. Bonds was

found dead in the bedroom of her home by her sister, Decrease Bonds, and Decrease's boyfriend,

Tresvon Hall.  There was an ice pick stuck in her chest and a large two-pronged fork protruding from her abdomen.  A chair lay on top of her, covering her face.

### 2.     **The BPD's Investigation and Arrest of Plaintiff**

27.     Decrease Bonds called the police from a neighbor's residence and, twenty to thirty minutes later, around 10:00 a.m., BPD officers Collins and Yarborough arrived, followed shortly by Defendants Kemp and McClendon, who collected evidence at the scene, including a plastic shower cap found near Ms. Bonds' leg.  No fingerprints were found in the residence.

28.     Shortly thereafter, and no later than 11:00 a.m. that morning, Officers Glover and Collins arrived at Plaintiff's residence and placed him under arrest for the murder of Angela Bonds.  Plaintiff answered the door in a shower cap and his pajamas, with no signs of bruising, swelling, or any other indicia of a struggle.  On information and belief, at the time of Plaintiff's arrest, the BPD possessed no physical evidence linking Plaintiff to the murder nor any other probable cause to arrest Plaintiff, but rather did so because Plaintiff's "name had come up" as being Ms. Bonds' boyfriend.  Officers Glover and Collins took Plaintiff to the BPD police station.

29.     At the station, BPD Officers, including Defendant Spikes and Defendant McClendon, initially questioned Plaintiff, during the course of which the officers indicated to Plaintiff that Ms. Bonds body had been found impaled with the ice pick and fork.  Plaintiff knew from his relationship with Ms. Bonds that, for her own protection, she sometimes kept similar instruments under her pillow.

30.     At approximately 12:00 p.m. on October 19, Plaintiff was again questioned at the BPD station, this time by Defendants Kemp and McClendon.  Certain of his innocence and having nothing to hide, Plaintiff waived his constitutional right to counsel and agreed to speak

with the officers.  The interrogation was not recorded or transcribed, and Plaintiff maintained his innocence throughout the questioning.

31.     Two days later, on October 21, Plaintiff was questioned a third time, this time in a taped interview with Defendant Edwards.  Continuing to maintain his innocence, Plaintiff again agreed to speak without counsel present.  During the course of his interview with Defendant Edwards, Plaintiff described the events on the night of Ms. Bonds' death, consistent with the events as set forth above at Paragraphs 24-25.

### 3.     Plaintiff's Indictment and Conviction at Trial

32.     In December 1984, a grand jury convened by Defendants Farmer and Murray indicted Plaintiff for the murder of Ms. Bonds.  On information and belief, the indictment handed down by the December 1984 Grand Jury rested in large part on testimony from BPD officers, including Defendants Kemp and McClendon, that Plaintiff, in his initial conversation with the officers, made statements reflecting a prior knowledge of the weapons used in the murder.

33.     Two years later, in January 1986, Defendants Reed and Murray convened a second Grand Jury to re-consider the indictment against Plaintiff, as further described herein, and on February 26, 1986, Plaintiff was put on trial for the murder of Angela Bonds.

34.     At Plaintiff's February 1986 trial, the State's case-in-chief featured prominently the testimony of Defendant Kemp that Plaintiff's statements during his untaped interview with Officers Kemp and McClendon reflected a knowledge of the use of the ice pick and fork in the murder that indicated Plaintiff's involvement in the crime. Yet, Defendant Spikes or other BPD officers were aware that Plaintiff had been previously informed of the use of these weapons in the murder by other BPD officers, as Plaintiff testified in his own defense.

9

35.     The trial testimony of pathologist Paul Gard also demonstrates that the officers' prior-knowledge charge against Plaintiff was untrue.  Mr. Gard testified at trial that, while Ms. Bonds was found impaled with the ice pick and fork, her cause of death was, in fact, from a cut to her jugular vein most likely made by a knife or other flat object.  Officers Kemp and McClendon, however, were unaware of the third murder weapon throughout their initial investigation.  Consistent with Plaintiff's explanation, therefore, Plaintiff's statements during the investigation regarding the ice pick and fork mirrored only what the BPD knew at the time, but were an incomplete description of the actual crime.

36.     Additionally, Defendant Phillips, an employee of the State Crime Lab, gave expert testimony that she was "ninety percent certain[]" that hair found in a shower cap next to Ms. Bonds' body and in the home where Plaintiff stayed regularly was Plaintiff's hair.

37.     This statement, however, was unsupported, was without any scientific basis and was plainly inconsistent with the contemporary, acceptable standards in the field of forensic hair comparisons,  under which the strongest statement an expert could make in a hair comparison was that the hairs were "consistent" with the defendant's or "could have" come from the defendant.  On information and belief, Defendant Phillips , knowingly overstated the reliability of her hair comparison analysis, and as a result, enhanced the perceived importance of the only direct, physical evidence presented by the State against Plaintiff at trial, prejudicing Plaintiff in his defense.

38.      Finally, Mr. Carl Magee, Jr. testified for the State that he had seen Plaintiff driving down the street away from Ms. Bonds home hours before her body was discovered, on the morning of October 19.  In relevant part, Mr. Magee testified that he saw Plaintiff around

6:00 a.m. that morning, that Plaintiff was wearing a "plastic cap" on his head and that Plaintiff "blew his horn and waved."

39.     In his initial sworn statement to police, which was not disclosed to Plaintiff or his counsel by Defendant Murray, Mr. Magee stated that on the morning that he saw Plaintiff, Mr. Magee was taking his trash to the curb.  On information and belief, the trash pickup day in Mr. Magee's neighborhood was the morning of October 18, when, according to Plaintiff's statement to police, he drove to work from Ms. Bonds' home around 6:30 a.m., and not October 19.

40.     In his defense at trial, Plaintiff took the stand, again asserted his innocence, and explained that the alleged "special knowledge" upon which the State relied so heavily was actually information stated to him by Officer Spikes prior to his untaped October 19 interview with Defendant's Kemp and McClendon.

41.     Additionally, in his defense, Plaintiff presented evidence supporting the theory that Ms. Bonds' killer was in fact another man: Matthew Brown.

42.     On June 26, 1985, while Plaintiff was in prison awaiting trial, Bevalina Brown, no relation to Matthew, was murdered in Bogalusa in the same home, 1010 Ann Street, where Ms. Bonds had been killed months before.  In fact, Ms. Brown's body was found in the same bedroom where Ms. Bonds had been found.  Weeks later, on July 12, 1985, a third woman, Regina Jackson, was murdered in Bogalusa, and her body was found within a few miles of the two prior homicides.

43.     Matthew Brown later confessed to BPD that he killed both Ms. Brown and Ms. Jackson, as Defendant Murray and Plaintiff's counsel stipulated during Plaintiff's trail.  Matthew Brown refused to testify in Plaintiff's trial based on his right against self incrimination.

11

44.     In support of the theory that Matthew Brown also killed Ms. Bonds, Plaintiff called in his defense Joseph Rogers, who had shared a cell with Mr. Brown in Orleans Parish jail in December 1985, after Brown was incarcerated for the other two murders.  Mr. Rogers testified at trial that Brown had bragged about killing three women and that, for one of the women that he claimed to have murdered, Brown further stated that there was an innocent person in prison for the murder.  Mr. Rogers also testified that he had first provided this information on January 3, 1986 in a letter to the 22ndJudicial District Court .

45.     Additional information about Matthew Brown came out at trial during the testimony of Defendant Edwards.  On cross-examination by Plaintiff's counsel, Defendant Edwards testified that he had spoken to Matthew Brown, but only in connection to "the other murder."  On redirect by Defendant Murray, Defendant Edwards changed his testimony to say that he had spoken with Matthew Brown about the murder of Angela Bonds, but that Mr. Brown had said that he did not kill her because he had been in New Orleans at the time.

46.     Defendant Edwards, when asked on cross by Plaintiff's counsel, testified that he did not remember speaking to Joseph Rogers.

47.     The jury convicted Plaintiff of second-degree murder, and Plaintiff was incarcerated on that conviction for over 20 years

4.      **The Suppressed Exculpatory Evidence**

48.      In fact, prior to, during and at all times after the trial, Defendants Murray and the 22nd JDDA's Office had in their possession numerous items of evidence regarding the potential connection between the murder of Angela Bonds and the subsequent murders of Bevalina Brown and Regina Jackson that were not disclosed or otherwise provided to Plaintiff or his counsel.  On information and belief, prior to, during and after Plaintiff's murder trial, Defendant Reed had

12

knowledge of this exculpatory evidence and that this evidence had not been disclosed to Plaintiff or his counsel.

49.     Defendant Edwards was also aware of much of this evidence at the time he provided his testimony in Plaintiff's murder trial.

50.     During the BPD investigation of the Brown and Jackson homicides, officers, including Defendants Edwards and McClendon, took the sworn, taped statements of numerous witnesses, including Stanley Lundy, Carlos Wayne Dunn, Danny Powell, and Kelvin Hayes with respect to the events that occurred at and around 1010 Ann Street on the evening of June 26, 1985, the night that Bevalina Brown was murdered.

51.     According to Mr. Lundy, Ms. Brown was outside her home in the company of Mr. Lundy, Mr. Dunn, Mr. Powell, Kelvin Hayes and Matthew Brown, when an argument developed between Ms. Brown and Mr. Hayes.  Mr. Hayes, who had been drinking, told Ms. Brown that he would "rape and kill her like the other bitch." Both Mr. Dunn and Mr. Powell gave sworn statements materially identical in relevant part regarding this statement by Mr. Hayes.  Mr. Hayes also gave a sworn statement to the BPD admitting having made such statements.

52.     In his sworn statement regarding the same conversation, Mr. Powell told Defendant Edwards that Mr. Hayes, during his argument with Ms. Brown, also made reference to Plaintiff's wrongful conviction for the Bonds murder, stating that "He (Hayes) told her, he said he would rape her, kill her in the same room that woman died, got killed before they say 'Haircut'(Mr. Johnson) killed. . . . Yea, he said if he raped anybody, he just going just as soon kill him cause he know he won't have nobody, she couldn't be a witness against to tell on him, to

say he did it."   "Haircut" was a nickname by which Plaintiff was known to many at all relevant times.

53.     On information and belief, at all times thereafter, including throughout and after Plaintiff's trial, these sworn statements were in the possession of Defendant Murray and the 22nd JDDA's Office.  None of these four sworn, taped statements, nor any information regarding their existence or substance, were given to Plaintiff or his counsel.

54.     Each of the four men, Lundy, Dunn, Powell and Hayes, also testified on or about August 9, 1985 to the Grand Jury convened by Defendant Murray in *State v. Brown* and provided materially identical testimony regarding the events of June 26, 1985 as their previous sworn statements to BPD officers.  As with the sworn taped statements, this grand jury testimony was not given to Plaintiff or his counsel.

55.     Matthew Brown subsequently confessed to the murders of Ms. Brown and Ms. Jackson and, on information and belief, was and is incarcerated by the State of Louisiana for these two murders.

56.     Between August and December 1985, while incarcerated for the murders of Bevalina Brown and Regina Jackson, Matthew Brown confessed on two separate occasions, once to Washington Parish inmate William Todd Morris and once to Orleans Parish inmate Joseph Rogers, that he was also responsible for the murder of Angela Bonds.

57.     Both of these confessions were known to Defendants Reed, Murray, the 22nd JDDA's Office and to Officer Edwards.  On information and belief, Defendants Reed and Murray reconvened the grand jury in Plaintiff's case in January 1986 in order to consider this new evidence.

14

58.     William Todd Morris testified to the January 1986 Grand Jury that, while in prison in Washington Parish, he shared a cell with Matthew Brown.  Mr. Morris further stated that, on one occasion, Mr. Brown began bragging about having killed two or three people.  Mr. Morris testified that Mr. Brown told him at that time that one of the girls he killed would not do anything with him, so he stabbed her with a fork and that someone else "was taking the rap" for one of the murders.  Neither the existence of Mr. Brown's jailhouse confession to Mr. Morris nor the existence or substance of Mr. Morris' January 1986 grand jury testimony were given or made known to Plaintiff or his counsel.

59.     Matthew Brown also confessed to Joseph Rogers that he killed Ms. Bonds.  As described above at Paragraph 44, Mr. Rogers testified to the circumstance and substance of Brown's confession to him on the stand at Plaintiff's trial.

60.     On January 22, 1986, Defendant Edwards testified to the second grand jury in Plaintiff's case that he received Mr. Rogers' letter and that he went, on January 14, 1986, and took a taped interview statement from Mr. Rogers on the subject of Matthew Brown's statements to Rogers.   During his grand jury testimony, Defendant Edwards played the tape of his interview with Mr. Rogers.  Neither the tape recording of this interview nor any transcript of the interview were ever provided to Plaintiff or his counsel.  Furthermore, Plaintiff's subsequent request for the tape revealed that the State no longer possesses the tape and cannot confirm that it still exists.

61.     Mr. Rogers did not testify as a live witness before the January 1986 Johnson Grand Jury.

62.     Under examination by Defendant Murray at the January 1986 grand jury hearing, Defendant Edwards also testified regarding the substance of the statement that he took from Mr.

15

Rogers.  Specifically, Defendant Edwards stated that "Matthew Brown told [Mr. Rogers] that he killed all three girls, both of them in the house and one in the airport.  However, he was going to let the boyfriend take the rap, because we had arrested the boyfriend. . . . Matthew told him he had killed all three of them in Washington Parish, plus two other guys, supposedly, that we don't know anything about.  The only other guy that we can figure out that he was talking about was the man that ran the bar, Henry Macoy.  He is missing, and we can't find him.  If that's who he is talking about, that's another murder."

63.     Regarding the reliability of Rogers' statements, Defendant Edwards also testified to this Grand Jury that Rogers had no reason to lie about Mr. Brown's statements and that Rogers' account included things the he could have only learned from Mr. Brown.  Defendant Edwards' testimony to the Grand Jury, including his statements indicating that Mr. Rogers' account raised Defendant Edwards' suspicion of yet another murder by Matthew Brown, was never turned over to Plaintiff or his counsel.

64.     In February 1986, just one month after (1) receiving Mr. Rogers' letter about Brown's confession; (2) meeting with and interviewing Mr. Rogers about Brown's statements; (3) testifying before a Grand Jury, as detailed in the paragraphs above, regarding his interview with Mr. Rogers; and (4) playing the tape of that interview for the Grand Jury, Defendant Edwards testified at Plaintiff's trial that he did not remember speaking with Mr. Rogers.

65.     Prior to and at trial, Plaintiff's counsel asked repeatedly for any pieces of exculpatory evidence.  Plaintiff's counsel initially moved for exculpatory material only to be told that "[t]he State has none."  Plaintiff's counsel also requested an *in camera* inspection of the State's file for exculpatory material, but the State opposed their request, and the trial court

declined to permit it.  Finally, Plaintiff's counsel requested favorable or exculpatory evidence in

a Motion for Discovery and Inspection that was similarly rejected.

66.     Even post-trial, during oral argument on Plaintiff's motion to set aside the verdict,

the prosecutor again asserted that the State did not posses any exculpatory material, stating that

"the state has no evidence that Mathew (sic) Brown had anything to do with this particular

murder.  The only thing that is there is a coincidental fact that two murders occurred in the same

residence.  That is a high coincidence. . . . We have turned up no other piece of evidence that ties

Mathew (sic) Brown into this case, nothing other than that coincidence."

67.     In the time since the conviction, this exculpatory evidence has been discovered in

the prosecutor's files, and the trial court has identified this suppressed exculpatory evidence as

constituting a violation of due process obligations imposed on the State under *Brady v.*

*Maryland*, 373 U.S. 83 (1963), and relied upon this ruling to vacate Plaintiff's conviction and to

give him his freedom.

### 5.     Plaintiff's conviction has now been vacated

68.     On March 18, 2004, the Innocence Project of New Orleans filed an Application

for Post Conviction Relief and DNA Testing on behalf of Plaintiff in the District Court for the

22nd Judicial District of Louisiana.

69.     In response to Plaintiff's application, physical evidence from the crime scene and

Ms. Bonds' body was submitted for DNA analysis with Reliagene.  Of the evidence submitted,

only nail clippings taken from Ms. Bonds' the morning of the murder contained a sufficient

amount of DNA for analysis.

70.     On March 21, 2006, a comparison of Plaintiff's DNA and the DNA from Ms.

Bonds' nail clippings revealed that Plaintiff was excluded as the source of the DNA under Ms.

Bonds' fingernails.

71.     On February 21, 2007, the 22nd Judicial District Court vacated Plaintiff's

conviction for the murder of Ms. Bonds and ordered a new trial on the basis of the DNA

evidence as well as the State's failure to provide the exculpatory evidence.  Plaintiff finally

regained his freedom when he was released from prison after serving more than twenty years for

a crime that he did not commit.  In support of its ruling, the trial court specifically identified

numerous items of evidence that the prosecutor withheld in violation of *Brady*, including:

> a)     the existence and substance of Mr. Brown's jailhouse confession to Mr. Morris and of Mr. Morris' January 1986 grand jury testimony regarding Mr. Brown's confession, as described in detail above at Paragraphs 57-58;

> b)     testimony given by Defendant Edwards to the January 1986 Grand Jury regarding his interview of Joseph Rogers, as described more fully above at Paragraphs 60-63;

> c)     the taped interview of Mr. Rogers conducted by Defendant Edwards and Mr. Rogers during which Mr. Rogers gave further details about Mr. Brown's confession to murdering three women in Bogalusa, as described more fully above at Paragraph 62;

> d)     the sworn statement made to BPD officers by Kelvin Hayes during the investigation of the murder of Bevalina Brown, described above at Paragraph 51;

> e)     the sworn, taped statement made to Defendant Edwards by Danny Powell during the investigation of the murder of Bevalina Brown, as described in detail above at Paragraphs 51-52;

> f)     the sworn, taped statement made to BPD officers by Carlos Wayne Dunn during the investigation of the murder of Bevalina Brown that Mr. Hayes threatened Ms. Brown, as described in detail above at Paragraph 51;

> g)     the sworn, taped statement made to BPD officers by Stanley Lundy during the investigation of the murder of Bevalina Brown regarding, among other things, Mr.

Hayes threats to kill Ms. Brown "like the other bitch," as described in detail above at Paragraph 51; and

     h)  the grand jury testimony of Messrs. Hayes, Powell, Dunn and Lundy given at the August 1985 Grand Jury in the matter of *State v. Brown* under examination by Defendant Murray, as described above at Paragraph 54.

  72.  The State appealed the court's ruling on the DNA evidence to the First Circuit Court of Appeal and requested reconsideration of the court's ruling on the issue of exculpatory evidence based on insufficient time to brief the issue.

  73.  In October 2007, the First Circuit Court of Appeal reversed the trial court's decision concerning the DNA evidence found in the nail clippings.  Plaintiff applied to the Louisiana Supreme Court for supervisory writs.

  74.  On May 14, 2008, the trial court held a rehearing on the issue of the State's failure to provide exculpatory evidence, but the court failed to rule on the issue, instead waiting for the Louisiana Supreme Court to rule on the DNA evidence.

  75.  On June 26, 2009, the Louisiana Supreme Court issued an order requiring the trial court to rule on the issue of exculpatory evidence.

  76.  On July 22, 2009, the trial court entered an order setting aside Plaintiff's conviction and granting him a new trial based on the State's suppression of exculpatory evidence.  According to the court, "the failure to disclose the exculpatory and impeachment evidence directly impacted the fundamental fairness of the proceedings in such a material way that had it been disclosed prior to trial, there is a reasonable probability of the defendant's acquittal."

  77.  The State applied for supervisory writs on the issue with the First Circuit Court of Appeal and the Louisiana Supreme Court.

78.     On October 9, 2009, the Louisiana Supreme Court denied the State's writ and affirmed the reversal of Plaintiff's conviction and the granting of a new trial based on the withholding of exculpatory evidence.  Because of the ruling granting Plaintiff a new trial on *Brady* grounds, the Louisiana Supreme Court did not issue a separate ruling on whether or not the DNA evidence alone was sufficient to support the grant of a new trial.

79.     Subsequently, a DNA comparison of the DNA from Ms. Bonds' nail clippings and blood samples from Matthew Brown revealed that Mr. Brown could not be excluded as the source of the DNA under Ms. Bonds' nails.

80.     Following the DNA comparison between the nail clippings and Matthew Brown, the State dismissed the indictment against Plaintiff on June 17, 2010 pursuant to a tolling agreement whereby they could re-indict Plaintiff by September 30.

81.     On September 15, 2010, the State informed Plaintiff that he would not be re-indicted for the murder of Ms. Bonds, finally ending Plaintiff's more than twenty-five year persecution for a crime of which he is innocent.

6.     **Prosecutorial misconduct and the suppression of exculpatory evidence under District Attorney Reed**

82.     The *Brady* violation of Plaintiff's rights caused by Defendants Murray's suppression of this exculpatory material is not an isolated instance, but rather reflects one of many *Brady* and similar violations involving prosecutorial misconduct committed by prosecutors in the 22nd JDDA's office during and before Defendant Reed's tenure as District Attorney.  *See, e.g., Burge v. Parish of St. Tammany*, 187 F.3d 452, 474-75 (5th Cir. 1999) (noting that the State failed to provide the defendant with several items of exculpatory evidence in his 1986 trial for murder); *Faulkner v. Cain*, 133 F. Supp. 2d 449 (E.D. La. 2001) (granting Faulkner's habeas

petition based on the failure to provide exculpatory evidence during his 1983 murder trial).  On information and belief, prosecutors in the 22nd JDDA's office have similarly withheld potentially exculpatory *Brady* material or otherwise violated the constitutional rights of criminal defendants on other occasions, consistent with a pattern and practice of such violations.

83.    The *Brady* violation of Plaintiff's rights caused by Defendant Murray's suppression of this exculpatory material and other similar violations involving prosecutorial conduct including, without limitation, *Brady* violations, malicious prosecutions of individuals without regard to guilt or innocence were known or should have been known to Defendant Reed, such that there was an obvious need to take steps to control, train, or supervise in order to prevent constitutional violations from occurring.  As such, the failure of Defendant Reed to take such actions to control, train or supervise prosecutors handling cases in his office amounted to a deliberate indifference to the unconstitutional practices of these prosecutors, directly resulting in the violation of Plaintiff's constitutional rights and Plaintiff's injuries as alleged herein.

## COUNT I

(42 U.S.C. § 1983 claim against Defendants Reed, Murray and the 22nd JDDA's Office for unconstitutional policy, custom, or practice and/or of deliberate indifference to the need to train or supervise)

84.    Plaintiff incorporates by reference all of the foregoing allegations.

85.    Defendants Reed, Murray and the 22nd JDDA's Office charged or indicted Plaintiff with the murder of Angela Bonds.

86.    Despite having in their possession exculpatory evidence that proved Plaintiff's innocence of this crime or cast serious doubt as to Plaintiff's being the perpetrator of the crimes,

Defendants Reed, Murray and the 22nd JDDA caused the prosecution of Plaintiff for the murder of Ms. Bonds.

87.     The destroyed or suppressed evidentiary materials were exculpatory as to Plaintiff's responsibility for the murder of Angela Bonds because they would have allowed Plaintiff to establish at trial, among other things, (1) the repeated confessions made by Matthew Brown to the murder of Ms. Bonds; (2) the veracity and reliability of Mr. Brown's confessions; (3) that Mr. Hayes had also made statements to the effect that he had killed Ms. Bonds;  and (4) that yet other witnesses had made statements tending to establish Plaintiff's innocence.

88.     Had this exculpatory evidence been considered and evaluated, there would have been no probable cause to proceed against Plaintiff, either before the Grand Jury or at trial.

89.      Plaintiff was eventually vindicated of the crime of murder and his conviction was vacated.

90.     The actions of Defendants Reed, Murray and the 22nd JDDA's Office constitute malicious prosecution in violation of Plaintiff's right to due process and a fair trial under the United States Constitution and under 42 U.S.C. § 1983.

91.     Defendants Reed, Murray and the 22nd JDDA's Office failed to disclose critical exculpatory evidence to Plaintiff prior to or during the murder trial.  The concealed exculpatory evidence was material, and the failure to turn over the evidence gave rise to constitutional violations of Plaintiff's rights under *Brady v. Maryland*, 373 U.S. 83 (1963).

92.     Through his direct actions and decisions as the final and official policymaker for the 22nd JDDA's Office, Defendant Reed intentionally, maliciously and with reckless disregard for and deliberate indifference to Plaintiff's rights, either participated in the withholding of the

exculpatory material and/or created and maintained an official policy, practice, and/or custom of ordering and compelling assistant district attorneys of his office to proceed with and maintain investigation and prosecution of Plaintiff without concern for his constitutional rights.

93.     In addition to or in the alternative, Defendant Reed, acting in his final policymaking authority and under color of law, created and maintained an official policy, practice, and/or custom of failing adequately to train, monitor and supervise the employees of the 22nd JDDA's Office regarding the constitutional duty to disclose exculpatory evidence to the defense, despite the obviousness that such training, monitoring or supervision was required in order to prevent constitutional violations.

94.     The general practice of withholding exculpatory evidence, even if not authorized by officially adopted or promulgated policy, was so common and well established as to constitute official policy that fairly represented the 22nd JDDA Office's official custom, policy and/or practice.

95.     Through his direct actions and decisions as final and official policymaker for the 22nd JDDA's Office, Defendant Reed intentionally, maliciously, and with reckless disregard for and deliberate indifference to Plaintiff's rights, participated in the withholding of the exculpatory evidence.

96.     Defendants' actions and the official policy, practice and/or custom resulted directly in the constitutionally deficient investigation and prosecutions of Plaintiff and abridged his rights guaranteed under the Fourth, Fifth, Sixth, Eighth and Fourteenth Amendments to the U.S. Constitution.

97.    The official policy, practice and/or custom of concealing exculpatory evidence and maliciously prosecuting individuals, without regard to guilt or innocence, proximately and directly caused Plaintiff's injuries, including spending over 20 years in prison for a murder he did not commit as well as the other injuries stated herein.

98.    Defendants are liable to Plaintiff for his conduct pursuant to 42 U.S.C. § 1983.

## COUNT II

(42 U.S.C. § 1985 claim against all individual defendants and John Does 1-25 for conspiracy)

99.    Plaintiff incorporates by reference all of the foregoing allegations.

100.    Upon information and belief, all individual defendants acted in concert and with other individuals, and, conspired among themselves and with others to intentionally, maliciously and with reckless disregard and deliberate indifference violate Plaintiff's constitutional rights under the Fourth, Fifth, Sixth, Eighth and Fourteenth Amendments of the Unites States Constitution.

101.    In furtherance of this conspiracy, Defendants engaged in the following overt acts, among others, as further described herein:

a)    Defendants withheld exculpatory evidence in order to ensure Plaintiff's indictment, conviction and incarceration for the murder of Angela Bonds;

b)    Defendants made and allowed to be made false statements to the courts and to juries in order to ensure Plaintiff's indictment, conviction and incarceration for the murder of Angela Bonds; and

c)   Defendants caused Plaintiff to be indicted and convicted and then imprisoned

and continually detained Plaintiff for over 20 years, all without probable cause

or other legal justification, and on the basis of unlawful convictions.

102.   Upon information and belief, in conducting these acts, these defendants were

acting pursuant to official policy of the 22nd JDDA's Office, the City of Bogalusa, and the BPD.

103.   Defendants' conspiracy amongst themselves and with other unnamed individuals

proximately and directly caused Plaintiff injuries, including spending over 20 years in prison for

a murder he did not commit as well as the other injuries stated herein.

104.   Defendants are liable to Plaintiff for his conduct pursuant to 42 U.S.C. § 1985.

### COUNT III

(42 U.S.C. § 1983 claim against Defendant Phillips for fabrication of evidence)

105.   Plaintiff incorporates by reference all of the foregoing allegations.

106.   Upon information and belief, Defendant Phillips, acting in bad faith, fabricated

evidence against Plaintiff by reporting false and misleading results from her microscopic hair

comparison testing, knowing that she had no scientific basis to draw the conclusion that her test

indicated with "ninety percent certainty" that the hair found at the crime scene belonged to

Plaintiff.

107.   Defendant Phillips failure to confine her opinion testimony to scientifically-based

conclusions violated Plaintiff's constitutional right to a fair trail and to due process of law under

the Fourteenth Amendment of the United States Constitution.

108.   As a direct result of Defendant Miller's conduct, Plaintiff endured an unfair trial,

was falsely convicted of murder, served over 20 years in prison for a crime that he did not

commit, and suffered additional injuries as described herein.

109.    Defendant Phillips in her official capacity as an employee of the State of Louisiana is liable to Mr. Brown for her conduct pursuant to 42 U.S.C. § 1983.

**COUNT IV**

(Louisiana state law claim for Malicious Prosecution against Defendants Reed, Farmer, Murray and the 22nd JDDA's Office)

110.    Plaintiff incorporates by reference all of the foregoing allegations.

111.    Defendants Reed, Farmer, Murray and the 22nd JDDA  charged or indicted Plaintiff with the murder of Ms. Bonds.

112.    Defendants Reed, Farmer, Murray and the 22nd JDDA's Office caused Plaintiff to be indicted, charged and prosecuted for the crime of murder without probable cause or other legal basis, as alleged herein.

113.    Despite having in their possession exculpatory evidence that proved Plaintiff's innocence of this crime or cast serious doubt as to Plaintiff being the perpetrator of the crimes, Defendants Reed, Farmer, Murray and the 22nd JDDA's Office caused the prosecution of Plaintiff for the murder of Ms. Bonds.

114.    The destroyed or suppressed evidentiary materials were exculpatory as to Plaintiff's responsibility for the murder of Angela Bonds because they would have allowed Plaintiff to establish at trial, among other things, (1) the repeated confessions made by Mr. Brown to the murder of Ms. Bonds; (2) the veracity and reliability of Mr. Brown's confessions; (3) that Mr. Hayes had also made statements to the effect that he had killed Ms. Bonds;  and (4) that yet other witnesses had made statements tending to establish Plaintiff's innocence.

115.    Had this exculpatory evidence been considered and evaluated, there would have been no probable cause to proceed against Plaintiff, either before the Grand Jury or at trial.

26

116.    Plaintiff was eventually vindicated of the crime of murder and his conviction was vacated.

117.    The actions of Defendants Reed, Farmer, Murray and the 22nd JDDA's Office constitute malicious prosecution of Plaintiff in violation of the laws of the State of Louisiana.

118.    Defendants' malicious prosecution of Plaintiff, proximately and directly caused Plaintiff's injuries, including spending over 20 years in prison for a murder he did not commit as well as the other injuries stated herein.

119.    Defendants are liable to Plaintiff for their conduct under the Laws of the State of Louisiana.

## COUNT V

(Louisiana State Law claim for Intentional and/or Reckless Infliction of Emotional Distress against all individual Defendants, the 22nd JDDA's Office and the City of Bogalusa)

120.    Plaintiff incorporates by reference all of the foregoing allegations.

121.    All individual defendants,  the 22nd JDDA's Office and the City of Bogalusa did intentionally, maliciously and with reckless disregard and deliberate indifference to Plaintiff's rights, engage in extreme and outrageous conduct in connection with the investigation and prosecution of Plaintiff, including but not limited to, malicious and deficient investigations and prosecutions of Plaintiff; proceeding with the prosecution of Plaintiff without probable cause; illegally destroying and/or concealing exculpatory evidence; and presenting and conspiring to present false and misleading argument and evidence to courts and juries, and as further described herein.

122.    The unlawful, extreme and outrageous acts of these Defendants were performed for the purpose of ensuring that Plaintiff was arrested, indicted, convicted imprisoned, so that

Defendants Reed, Murray, and the 22nd JDDA's Office could secure a victory in the Bonds murder.

123.    Defendants Reed, Farmer, Murray and the 22nd JDDA's Office did intentionally, maliciously and with reckless disregard and deliberate indifference for Plaintiff's rights, engage in extreme and outrageous conduct in connection with the prosecution of Plaintiff, including but not limited to, convening a grand jury for improper purposes, ignoring and suppressing key exculpatory evidence and conspiring to convict Plaintiff of murder without due regard to his innocence.

124.    All individual defendants, the 22nd JDDA's Office and the City of Bogalusa desired to inflict by their actions severe emotional distress on Plaintiff and/or knew that severe emotional distress would be certain or substantially certain to result from their conduct.

125.    As a proximate and direct result of these Defendants extreme and outrageous actions, Plaintiff suffered severe and emotional distress, including but not limited to the effects of losing his freedom for the over 20 years of his life during which he was wrongly incarcerated as a result of Defendants actions, for which he is entitled to damages.

126.    Defendants are liable to Plaintiff for their conduct under the Laws of the State of Louisiana.

## COUNT VI

(State law defamation claim against Defendants Kemp, McClendon, Edwards and Spikes)

127.    Plaintiff incorporates by reference all of the foregoing allegations.

128.     Defendants  Kemp, McClendon, Edwards and Spikes published false and defamatory statements about Plaintiff when they described Plaintiff's alleged special knowledge

28

of the murder weapons and when they otherwise described Plaintiff's guilt for the murder of Angela Bonds.

129.    In publishing these statements, Defendants Kemp, McClendon, Edwards and Spikes acted with actual malice, knowing that the statements were false.

130.    As a result of the actions of these Defendants, Plaintiff suffered the ignominy of being labeled in his community as a murderer, suffered injury from his twenty-plus-year confinement including, but not limited to, pain and suffering, sever mental anguish, loss of personal freedom, personal contact and injury to reputation.

131.    Defendants Kemp, McClendon, Edwards and Spikes are liable to Plaintiff for defamation.

## COUNT VII

(Direct action pursuant to Louisiana Revised Statute § 22:655 against Defendant ABC Insurance Companies 1-10)

132.    Plaintiff incorporates by reference all of the foregoing allegations.

133.    Upon information and belief, Defendant ABC Insurance Companies 1-10 have issued and currently have in effect one or more policies of insurance covering one or more of the Defendants named herein.  For valuable consideration received, these policies obligated Defendant ABC Insurance Companies 1-10, jointly and/or severally, to pay on behalf of their insured Defendant(s) any sums the insured Defendant(s) may become obligated to pay to Plaintiff or to indemnify their insured Defendant(s) for any sums the insured Defendant(s) may become obligated to pay Plaintiff.

134.    By reason of their illegal and unconstitutional acts, Defendants are liable to Plaintiff for all damages and injuries Plaintiff has suffered as a proximate and direct result.

Upon information and belief, Defendant ABC Insurance Companies 1-10 are contractually obligated to pay these sums on behalf of the insured Defendant(s) or are obligated to indemnify the insured Defendant(s) for these sums.

135.    Upon information and belief, Defendant ABC Insurance Companies 1-10 are liable to Plaintiff for any and all damages incurred by reason of the insured Defendant(s)' acts up to their policy limits, notwithstanding the fact that the insured Defendant(s) may themselves be able to assert claims of privilege or immunity from liability.

136.    Pursuant to Louisiana Revised Statute § 22:655(B), Plaintiff brings a direct action against Defendant Insurance Companies 1-10 to recover any and all sums they are obligated to pay Plaintiff on behalf of their insureds or to indemnify their insureds.

## **PRAYER FOR RELIEF**

**WHEREFORE**, Plaintiff requests that this Court enter judgment against all Defendants on all counts of this Complaint: (a) awarding Plaintiff compensatory and punitive damages in amounts to be determined at trial; (b) awarding Plaintiff costs and reasonable attorneys fees in this action; and (c) granting such other and further relief as this Court deems just and proper.

30

## DEMAND FOR JURY TRIAL

Plaintiff demands a trial by jury on all counts set forth herein.

Dated:  October 8, 2010

Respectfully submitted,

  /s/ Rachel Conner
Rachel Conner (Bar No. 29726)
4833 Conti Street, Suite 207
New Orleans, Louisiana 70119
Phone:  (504) 427-7038
Fax:  (504) 373-5286
Email:  rachelisabelconner@gmail.com

John E. Hall
Benjamin S. Haley
COVINGTON & BURLING LLP
1201 Pennsylvania Avenue, N.W.
Washington, D.C. 20004
Phone: (202) 662-6000
Fax: (202) 778-5194
Email:  bhaley@cov.com

*Attorneys for Plaintiff Anthony Johnson*